AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | |
| CARL BRADLEY JOHANSSON, | |
| Defendant(s) | |

**LODGED**
CLERK, U.S. DISTRICT COURT

07/01/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ____ jbb ____ DEPUTY

Case No.   5:21-mj-00461

**FILED**
CLERK, U.S. DISTRICT COURT

Jul -2 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ ib ___ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of April 24, 2020 through March 24, 2021, in the county of Riverside in the Central

District of California, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1344(2), 2(b), 1349 | Bank Fraud, Causing An Act To Be Done, Conspiracy To Commit Bank Fraud |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

/ S /
_____
*Complainant's signature*

Daniel Dreyer, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   7/2/2021

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Alexander F. MacKinnon, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Matthew O'Brien, ext. 8644

## ATTACHMENT TO COMPLAINT

Offense Descriptions:

### [18 U.S.C. §§ 1344(2), 2(b)]

On or about January 19, 2021, in Riverside County, within the Central District of California, and elsewhere, defendant CARL BRADLEY JOHANSSON, also known as ("aka") "Brad Johansson," aka "Brad Johnson," aka "Carl Johnson," "C. Brad Johanson," aka "Jay Johnson," aka "Keith Golatta, " aka "Keith Golwick" ("JOHANSSON"), acting with the intent to defraud, knowingly executed and attempted to execute a scheme to defraud a federally-insured financial institution, as to material matters, and to obtain moneys and funds owned by and in the custody and control of the Bank by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts. To execute the fraudulent scheme, defendant JOHANSSON submitted, and caused to be submitted, a Paycheck Protection Program ("PPP") loan forgiveness application for his company Western Distribution, LLC in the amount of $436,390, which falsely claimed that Western Distribution, LLC employed certain workers, and used its PPP loan to pay salaries for those certain workers, when those workers were not in fact employed by Western Distribution, LLC and had not been paid by Western Distribution, LLC using its PPP funds.

### [18 U.S.C. §1349]

From on or about April 24, 2020 through March 24, 2021, in Riverside County, within the Central District of California, and elsewhere, defendant JOHANSSON, together with others known and unknown, conspired to commit bank fraud, in violation of Title 18, United States Code, Section 1344. The objects of the conspiracy were carried out, and to be carried out, in substance as follows:

In April 2020, defendant JOHANSSON, and his co-conspirators, would cause Western Distribution, LLC to apply for and obtain a PPP loan in the amount of $436,390, yet fail to disclose on the PPP loan application that Western Distribution, LLC shared common management (*i.e.*, defendant JOHANSSON) with other businesses, and falsely claim on the PPP loan application that Western Distribution, LLC would spend the loan proceeds in accordance with the PPP rules. In September 2020, defendant JOHANSSON, and his co-conspirators, would cause 21 individuals to be placed on Western Distribution, LLC's payroll, even though those 21 individuals did not work for Western Distribution, LLC and their salaries were being paid by a separate company. Defendant JOHANSSON, and his co-conspirators, would cause Western Distribution, LLC to submit a PPP loan forgiveness application in January 2021 that falsely claimed that the 21 individuals worked for Western Distribution, LLC so that Western Distribution, LLC could meet the PPP loan-forgiveness eligibility requirement that at least sixty percent of a company's PPP loan be spent on payroll. In March 2021, defendant JOHANSSON, and his co-conspirators, would cause Western Distribution, LLC to apply for a second PPP loan in the amount of $231,527, using the same fraudulent scheme whereby they represented – falsely – the number of employees who worked for Western Distribution, LLC in order to obtain a larger loan.

## Contents

I.    INTRODUCTION...........................................1

II.   SUMMARY OF PROBABLE CAUSE.............................2

III.  THE PAYCHECK PROTECTION PROGRAM......................6

IV.   STATEMENT OF PROBABLE CAUSE..........................8

    A.   JOHANSSON's History of Concealing His Involvement
        in His Trucking Companies........................8

    B.   JOHANSSON's Formation of Western Distribution,
        LLC in Early 2019...............................15

    C.   JOHANSSON's Fraudulent Use of Advanced Fuel
        Delivery's Name and DOT Registration Number.....17

    D.   JOHANSSON's Decision to Make Western
        Distribution, LLC a Defunct Entity as of
        September 2019..................................19

    E.   JOHANSSON's Control of Western Distribution, LLC
        ...............................................22

    F.   Western Distribution, LLC's First PPP Loan
        Application in April 2020.......................23

    G.   Company A's PPP Loan Application in April 2020..26

    H.   Western Distribution, LLC's Expenditure of Its
        First PPP Loan..................................29

    I.   The Transfer of Company A's Employees to Western
        Distribution, LLC's Payroll Account.............32

    J.   Western Distribution, LLC's Fraudulent PPP Loan
        Forgiveness Application.........................35

    K.   Western Distribution, LLC's Fraudulent Second PPP
        Loan Application in March 2021..................38

    L.   JOHANSSON's Concurrent Fraud on the Department of
        Transportation.................................41

V.    CONCLUSION...........................................45

## AFFIDAVIT

I, DANIEL DREYER, being duly sworn, declare and state as
follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with Internal Revenue
Service - Criminal Investigations ("IRS-CI") in the Los
Angeles Field Office.  I have been a Special Agent since July
2017.  I am presently assigned to a group located in Santa
Ana, California.  I attended college at University of
California, Santa Barbara, where I obtained a bachelor's
degree in Business Economics with Emphasis in Accounting in
2002.  After graduation, I worked in the field of public
accounting for approximately 12 years where I obtained the
job title of Senior Audit Manager.  In 2008, I became
licensed as a certified public accountant ("CPA") in the
State of California and I have maintained the requirements
for this license since that date.  As an audit manager, I
oversaw complex audit engagements, including the analysis of
risks associated with financial fraud.  Additionally, I
focused on methods and types of financial fraud and what
measures can be used to detect and deter such activity.  I
attended training for approximately six months at the Federal
Law Enforcement Training Center in Glynco, Georgia, where I
graduated in February 2018.  During my training, I learned
investigative techniques used by the Internal Revenue Service
("IRS") to investigate the criminal violations found in
Titles 18, 26, and 31 of the United States Code that fall

under IRS-CI's investigative jurisdiction.  I have assisted in the execution and planning of search warrants related to a number of violations.  As a Special Agent, I have investigated money laundering, tax fraud, and Bank Secrecy Act violations.  As a result of my training and experience, I am familiar with the methods used by criminals to commit these types of offenses.

2.    I make this affidavit in support of an application for an arrest warrant for Carl Bradley Johansson ("JOHANSSON") for violations of 18 U.S.C. §§ 1344(2) and 2(b) (bank fraud and causing an act to be done) and 18 U.S.C. § 1349 (conspiracy to commit bank fraud).

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   <u>SUMMARY OF PROBABLE CAUSE</u>

5.    In April 2018, a federal grand jury indicted JOHANSSON, two of his employees, and two of his trucking companies for conspiracy, welding without required certifications, and false statements (C.D. Cal. Case No. 5:18-CR-114-VAP) (the "Pending Criminal Case").  A first superseding

2

indictment, which added six counts against JOHANSSON for tax evasion, was filed on or about November 14, 2018, and a second superseding indictment was filed on or about November 20, 2019. JOHANSSON and the other defendants pleaded not guilty to all charges.  A trial is scheduled for September 14, 2021 before the Honorable Virginia A. Phillips.

6.   In the Pending Criminal Case, the government alleges, *inter alia*, that JOHANSSON owned and controlled a series of trucking companies yet kept his name off of his companies' books in order to (1) conceal his own involvement in the companies from regulators investigating welding explosions at the companies, and (2) avoid paying federal income taxes on his considerable income from the companies.  (In 1999, JOHANSSON pled guilty to a similar scheme resulting from a different welder's death; JOHANSSON was sentenced to 15 months in prison (C.D. Cal. Case No. 98-CR-674-RAP).)

7.   In March 2019, while on pre-trial release in the Pending Criminal Case, JOHANSSON set up yet another trucking company, Western Distribution, LLC, and registered it as an LLC in Wyoming.  Western Distribution was based in Buena Park, California (it is now based in Ontario, California), and focuses on the transportation of jet fuel.  In September 2019, JOHANSSON converted Western Distribution, LLC into Advanced Distribution, Inc. and then converted Advanced Distribution, Inc. into Western Distribution, Inc.  From that point forward, Western Distribution, LLC no longer existed as a legal entity; nonetheless, JOHANSSON continued operating the LLC as if nothing

had changed.

8.   In early 2020, when the COVID-19 pandemic hit the
United States, the federal government responded, as relevant
here, by setting up the Paycheck Protection Program ("PPP"),
whereby eligible businesses could apply to the Small Business
Administration ("SBA") for low-interest (and potentially
forgivable) loans to obtain money that was to be used primarily
to pay their employees.  The first page of the PPP loan
application asked applicants, *inter alia*, if they or their
owners were currently under indictment, and if they shared
common management with any other businesses.

9.   On or about April 24, 2020, under JOHANSSON's
direction, Western Distribution, LLC applied to a federally
insured bank (the "Bank") for a PPP loan in the amount of
$436,390, even though the LLC no longer existed.  JOHANSSON
listed his son, Co-conspirator #1, as the owner of Western
Distribution, LLC on the application, enabling him to answer the
"are your owners under indictment" question in the negative.
Despite the fact that JOHANSSON controlled and managed Western
Distribution, LLC at the same time that he controlled and
managed other companies -- including Wholesale Distribution,
Inc. (one of JOHANSSON's co-defendants in the Pending Criminal
Case), and "Company A" -- the application claimed that Western
Distribution, LLC had no common management with any other
companies.  The application was approved, and Western
Distribution, LLC received a PPP loan in the amount of $436,390.

10.   "Company A" is another trucking company controlled by

JOHANNSON.  It is based in Gustine, California and focuses on
the transportation of agricultural materials.  On or about April
15, 2020, under JOHANSSON's direction, Company A applied to
another federally insured bank for its own PPP loan in the
amount of $286,505.  JOHANSSON had his 85-year old mother listed
as Company A's owner on Company A's PPP application, enabling
him to again answer the "are your owners under indictment"
question in the negative.  Like Western Distribution, LLC's
application, Company A's application claimed that Company A had
no common management with any other businesses.  Company A's
application was approved, and the company received a PPP loan in
the amount of $286,500.

11.  Under JOHANSSON's direction, Western Distribution, LLC
immediately spent its PPP funds in May and June 2020, in large
part on expenses unrelated to its payroll.  Rather than using
the funds to keep his employees at Western Distribution, LLC on
payroll, JOHANSSON laid off most of the company's employees.
Later in 2020, when Western Distribution, LLC's business picked
back up, JOHANSSON rehired many of the same employees.

12.  In order to create the impression that Western
Distribution, LLC had spent more of its PPP loan on its payroll
than it really did, in September 2020 JOHANSSON moved 21 of
Company A's employees onto Western Distribution, LLC's payroll.
This substantially increased Western Distribution, LLC's
purported payroll, and made it look like Western Distribution,
LLC was spending much more of its money on payroll than it
really was, just before its 24-week window for spending the PPP

funds closed.  As a result of this ruse, Western Distribution, LLC could claim -- falsely -- on its PPP loan forgiveness application to the Bank in January 2021 that the company had met the requisite threshold of spending at least sixty percent of its PPP loan on payroll.  In fact, as JOHANNSON was aware, Western Distribution, LLC had spent much of the PPP loan on other expenses in May and June 2020 and effectively laid off most of its employees.  As JOHANSSON was also aware, none of Company A's employees ever actually worked for Western Distribution, LLC in 2020; JOHANSSON had transferred them onto Western Distribution, LLC's payroll solely as part of a shell game to conceal his scheme from the Bank and federal regulators.

13.  In March 2021, JOHANSSON caused Western Distribution, LLC to repeat the same fraudulent representations concerning its employee lists and payroll numbers when the company submitted a second PPP loan application, for $231,527, to the Bank.

### III. <u>THE PAYCHECK PROTECTION PROGRAM</u>

14.  The CARES Act is a federal law enacted in around March 2020 and was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP.  In approximately April 2020, Congress authorized over $300 billion in additional PPP funding.

15.  In order to obtain a PPP loan, a qualifying business

must submit a PPP loan application, which is signed by an authorized representative of the business.  The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  One such certification requires the applicant (through its authorized representative) to affirm that "[t]he [PPP loan] funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments; I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges."  In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

16.  PPP loan proceeds must be used by the business on certain permissible expenses -- payroll costs, interest on mortgages, rent, and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within

a designated period of time (usually 24 weeks after receiving the proceeds) and uses at least sixty percent of the PPP loan proceeds on payroll expenses.

17.   The PPP loan application includes eligibility questions pertaining to current and past criminal histories of any and all individuals owning twenty percent or more of the applicant company.  These questions are further certified by the signer with the understanding that any material false statements are punishable under specified laws and subject to both fines and imprisonment.  The application states that any recent felony conviction or current indictment of an owner of twenty percent or more of an applicant makes the applicant ineligible for PPP funding.

IV.   **STATEMENT OF PROBABLE CAUSE**

Based upon my review of investigative reports and notes, bank records, witness statements, my discussions with other law enforcement officers working on this investigation, and other evidence, I learned the following:

A.   **JOHANSSON's History of Concealing His Involvement in His Trucking Companies**

1.   National Distribution Services, Inc.

23.   On or about September 27, 1993, L.Q., a welder at Atlas Carrier, Inc. ("Atlas"), located in Montebello, California, was killed while working inside a cargo tanker when his welding torch ignited fumes.  Atlas, a hazardous-materials transportation company, was not registered with the United States Department of Transportation ("DOT") to perform the

repair of cargo tanks and did not have the "R" Stamp
certification required to carry out such welding.  JOHANSSON was
the president and owner of Atlas, which did business under
several names including Ash Transportation, Inc., Petroleum
Delivery Services, and Ash Incorporated.

24.  As result of the investigation into L.Q.'s death, in
around June 1998 JOHANSSON and an Atlas manager were indicted by
a federal grand jury on five counts, specifically, one count of
violating 18 U.S.C. § 371 and four counts of violating 49 U.S.C.
§ 5124 (welding without an "R" stamp).  *See United States v.
Carl Bradley Johansson*, Case No. 98-CR-674-RAP (C.D. Cal.).
JOHANSSON pled guilty and was sentenced in 2000 to a term of 15
months' imprisonment followed by two years of supervised
release.  Upon his release from prison, JOHANSSON returned to
managing his trucking companies.

25.  In 2007, the federal government sued JOHANSSON for
employment taxes owed by his former company, Atlas Bulk, Inc.
(C.D. Cal. Case No. 07-CV-659-AHS).  The district court entered
judgment against JOHANSSON in 2008 for $923,440.  After the
judgment was entered, JOHANSSON filed no personal tax returns
(and paid no personal income taxes) until after he was indicted
again in 2018, despite earning over a million dollars in
unreported income from his trucking companies during that period
and despite enjoying a lifestyle that included, for example,
living in a 16,000-square-foot mansion in Corona for which he
paid approximately $16,000 each month in rent from 2012 to 2018.

26.  By no later 2012, JOHANSSON had taken control of

National Distribution Services, Inc. ("National"), a hazardous-materials transportation company based in Corona.  Bank records and employee interviews confirm that JOHANSSON controlled all aspects of National's business, from operations to banking.  Yet as a result of the tax case and increasing regulatory scrutiny regarding his trucking companies' safety, JOHANSSON went to great lengths to conceal his involvement in National.  For example, when JOHANSSON took control of National, he listed his former prison mate, W.S., as the President, Secretary, Treasurer, and Director of National on many corporate filings. JOHANSSON even created a fictional persona, "Keith Golatta," to use as an alias on corporate filings.  On telephone conversations with National's customers and in other instances, JOHANSSON sometimes said that he was "Keith Golatta," even though no such person existed.

27.  After JOHANSSON failed to satisfy the tax judgment, in 2012 the IRS filed a tax lien against CBSA, a family partnership controlled by JOHANSSON's wife, which owned the industrial property in Corona where National was based.  The IRS alleged that CBSA was JOHANSSON's nominee.

28.  On or about September 25, 2012, D.L.V., one of JOHANSSON's welders at National, was almost killed in an explosion during a welding repair on one of National's tankers.

29.  On or about May 6, 2014, S.E., JOHANSSON's other welder at National, was killed by an explosion when his welding torch ignited fumes inside one of National's tankers.  As with the fatal 1993 explosion at Atlas and the 2012 explosion at

National, the welding was taking place at JOHANSSON's company even though the company lacked the federally required "R" Stamp to conduct such welding.  D.L.V., the same welder who narrowly survived the 2012 explosion, was seriously injured during the explosion on or about May 6, 2014.

30.  An investigation into the deadly explosion on May 6, 2014 ensued.  During the investigation, JOHANSSON continued to conceal his ownership and control of National.  For example, on or about May 6, 2014, JOHANSSON told investigators that he was a customer service representative at National.  JOHANSSON also claimed that he was merely a "temp" and "paper pusher" at National.  To cover his tracks, in the weeks after the explosion in May 2014, JOHANSSON arranged for National to hire a staffing company to hire JOHANSSON as a temp at National, even though JOHANSSON owned and controlled National.

        2.   <u>Wholesale Distribution, Inc.</u>

31.  As a result of the deadly explosion in May 2014, federal regulators imposed strict restrictions on the operations at National.  To evade those restrictions, JOHANSSON shut down National and started a nearly identical company, Wholesale Distribution Services, Inc. dba Quality Services ("Wholesale"), in late 2014 and early 2015.  Wholesale operated out of the same warehouse as National, operated the same trucks, and had most of the same drivers and office staff as National.  As he had done at National, JOHANSSON listed a "straw man" -- J.C., who sold tires to JOHANSSON -- as Wholesale's President and Owner on corporate records, even though J.C. had almost no involvement in

Wholesale.  J.C. has confirmed that he was unaware that JOHANSSON used his name and signature on Wholesale's corporate filings for years.

32.  Bank records and employee interviews confirm that, from 2015 to the present, JOHANSSON has controlled every aspect of Wholesale, from operations to finances to criminal defense issues.  Every employee of Wholesale ultimately answers to JOHANSSON.  It was not until JOHANSSON and Wholesale were indicted in the Pending Criminal Case in 2018 that JOHANSSON finally began publicly admitting the scope of his involvement in Wholesale.  In the Pending Criminal Case, JOHANSSON repeatedly has described himself as the corporate representative of Wholesale.

3.   "Company A"

33.  As noted above, Company A is a trucking company based in Gustine, California that hauls agricultural products.  During the investigation into, and civil litigation regarding, the death of JOHANSSON's welder on or about May 6, 2014, JOHANSSON consistently downplayed his role at Company A.  For example, JOHANSSON acknowledged that he had been a member of Company A's Board of Directors, but claimed that he was only a consultant and that he had no knowledge as to who owned Company A.  Based on my training and experience and my knowledge of the facts of this case, I believe that JOHANSSON was deliberately minimizing his role at, and command of, Company A.  For example, as a result of my investigation, I am aware of the following information:

a.   Even though JOHANSSON has claimed, under oath, that he does not know who owns Company A, JOHANSSON's own company, Systems Logistics, Inc. dba Tech Logistics ("Tech Logistics"), bought Company A in around 2003.  While JOHANSSON also has tried to distance himself from Tech Logistics, he himself signed the Stock Purchase Agreement in which Tech Logistics bought Company A in 2003, in his capacity as Tech Logistics' Managing Director.  (JOHANSSON's wife signed the same agreement as the buyer's President.)  Likewise, a document obtained from the California Secretary of State, entitled "Statement of Information" and dated October 14, 2003, shows that JOHANSSON signed the document and described himself as the Managing Director of Tech Logistics.  JOHANSSON's personal attorney in Newport Beach was listed on the same document as Tech Logistics' registered agent for service of process.

b.   Even though JOHANSSON has claimed, under oath, that he had a very limited role at Company A, documents obtained from the California Secretary of State show that:  (1) on or about July 19, 2015, JOHANSSON -- using the alias "Brad Johnson" -- filed an Amended Articles of Incorporation for Company A, in which he stated under oath that he was the President and Secretary of Company A and in which he slightly modified the company's name; and (2) on or about September 21, 2015, JOHANSSON, again using the alias "Brad Johnson," filed an Amended Articles of Incorporation, in which he stated that he was the President and Secretary of the newly named company and in which he changed the name of the company back to Company A's

13

original name.

       c.    A similar document, dated on or about October 27, 2010, lists "Keith Golwick" as Tech Logistics' Director.  Based on my investigation in this case, I believe that "Keith Golwick" may be another of JOHANSSON's aliases.  As set forth above, it is well established that JOHANSSON frequently used the alias "Keith Golatta" to conceal his involvement in National.  (I have checked law enforcement databases for individuals named "Keith Golatta" and "Keith Golwick" and found no individuals with those names during the relevant time periods.)

       d.    Documents obtained from another bank ("Bank B") confirm JOHANSSON's longstanding financial control of Company A. For example, a document entitled "Accounts Receivable Financing and Security Agreement," between Bank B and Company A and dated or about July 5, 2006, listed JOHANSSON as the CEO of Company A and JOHANSSON's wife as the Director of Company A.  A related document from Bank B, entitled "Lockbox Service" and dated on or about March 4, 2015, was signed by JOHANSSON, who described himself as Company A's Director.  According to "Company A's Manager" (who has been the onsite manager for Company A's truck yards in Turlock and Gustine for the last two decades), the financing of Company A's receivables allowed for money to be borrowed by Company A against future payments from customers. In an interview, Company A's Manager said that the first draw of the loan -- which amounted to several hundred thousand dollars -- was transferred to JOHANSSON and not used by Company A.

       e.    Company A's Manager said in prior sworn testimony

that, ever since Tech Logistics acquired Company A in 2003, JOHANSSON has controlled Company A's Manager's employment at Company A, acquired trucks for Company A, and handled all of Company A's insurance policies for its trucks.  Company A's Manager repeated these statements in an interview in June 2021, adding that JOHANSSON's wife assisted on insurance issues.

      f.   JOHANSSON commonly obtained insurance policies that covered National's (and Wholesale's) trucks as well as Company A's trucks.  Several such documents listed, for example, the insured as "National Distribution Services, Inc. DBA [Company A]."

    **B.**   **JOHANSSON's Formation of Western Distribution, LLC in Early 2019**

34.  According to documents filed with the Wyoming Secretary of State and emails between JOHANSSON and Wyoming Corporate Services, Inc. (which appears to be a dba of Capital Administrations, LLC, the "Registered Agent" for Western Distribution, LLC in Wyoming), JOHANSSON caused Western Distribution, LLC to be registered as an LLC in Wyoming on or about March 6, 2019.  To my knowledge, this marked the formation of Western Distribution, LLC as a legal entity.[1]  JOHANSSON was billed approximately $1,120 by the Registered Agent to set up the LLC.

---

[1] A document entitled "Operating Agreement Member Managed," allegedly dated February 25, 2019, purports to show the formation date of Western Distribution, LLC as on or about February 25, 2019.  The date on that document does not appear to be credible given that the same document states that the company's Articles of Organization were filed with the Wyoming Secretary of State on or about March 6, 2019.

35.  Emails between JOHANSSON and the Registered Agent confirm JOHANSSON's role in the creation of Western Distribution, LLC.  For example, JOHANSSON used his own name, email address, and phone number when communicating with the Registered Agent.

36.  An IRS Form SS-4, dated on or about March 14, 2019, establishing the Employer Identification Number for Western Distribution, LLC, was sent to JOHANSSON as a member of the LLC.

37.  According to a document entitled "Application to Register a Foreign Limited Liability Company LLC" from the California Secretary of State's website, Western Distribution, LLC was registered as a Wyoming LLC in the State of California on or about April 22, 2019.

38.  On or about April 25, 2019, JOHANSSON submitted a Form MCSA-1 to register Western Distribution, LLC with the Federal Motor Carrier Safety Administration ("FMCSA").  The Form MCSA-1 is an application that businesses use in order to register with FMCSA.  In response to a question asking the applicant to list the names of its officers, JOHANSSON listed himself.

39.  The MCSA-1 Form asked, "Do you currently have, or have you had within the last 3 years of the date of filing this application, relationships involving common stock, common ownership, common management, common control or familial relationships with any FMCSA-regulated entities?"  Even though JOHANSSON was the sole officer of Wholesale and Wholesale was a FMCSA-regulated entity (because, for example, it transported jet fuel in interstate commerce), JOHANNSON checked "No."  In the

"APPLICANT'S OATH" field, JOHANSSON's name was printed and digitally signed.  JOHANSSON expressly verified that "all information supplied on this form or relating to this application is true and correct."[2]

### C.   JOHANSSON's Fraudulent Use of Advanced Fuel Delivery's Name and DOT Registration Number

40.  Advanced Fuel Delivery, LLC ("Advanced") was a trucking company based in Riverside.  According to an interview of "Advanced's Managing Partner" in June 2021, Advanced was planning to shut down its operations in 2019.  In 2019, JOHANSSON offered the owners of Advanced approximately $25,000 to purchase the company's name and licenses.  The owners rejected JOHANSSON's offer for being too low.

41.  Thereafter, JOHANSSON appears to have started using Advanced's name and DOT registration number (3049566) as his own.  In interviews in June 2021, Advanced's Managing Partner said that (1) he had no knowledge that JOHANSSON was using Advanced's name and DOT registration number, and (2) there was no reason for Advanced to apply for insurance policies in 2019 because the company was winding down.  Even though JOHANSSON had no ownership rights in Advanced, he applied for and obtained insurance for his companies using Advanced's name and DOT registration number in 2019 and 2020.  Documents obtained from the insurer show, for example:

        a.   A Commercial Insurance Application, dated on or

---

[2] On or about December 9, 2020, shortly after JOHANSSON learned of this investigation, Western Distribution, LLC submitted another Form MCSA-1 in which it admitted that it did share common management with Wholesale.

about June 18, 2019, listed Advanced as the applicant and included a "dba Advanced Distribution" as well as "Western Distribution" as another "Named Insured."  The contact name for the applicant is "Jay Johnson," who listed his email address as JOHANSSON's email address at Western Distribution, LLC and his phone number as the phone number that JOHANSSON commonly listed for Western Distribution, LLC (XXX-XXX-6840).[3]  In response to the question of whether the applicant has been indicted for any crime of fraud, "Jay Johnson" responded, "N."

        b.    An insurance document entitled "Risk Engineering Field Evaluation," dated on or about August 24, 2020, also listed the contact for Advanced as a "Jay Johnson," who again used JOHANSSON's email account at Western Distribution, LLC as well as the same phone number associated with JOHANSSON.  The Evaluation reports listed Advanced's DOT number (3049566) and observed that "Jay runs the business day to day" and has "[b]een in the petroleum distribution business for 25 years."

        c.    A follow-up insurance policy, dated on or about November 19, 2020, listed the insured as "Advanced Distribution, Inc. dba Western Distribution."

        d.    "Jay Johnson," again using JOHANSSON's email

_____

        [3] This phone number appears to have been used previously by J.S., one of JOHANSSON's shop employees at Wholesale Distribution, Inc.  When J.S. left Wholesale, JOHANSSON appears to have begun using the number himself.  For example, phone records for the same number (XXX-XXX-6840) show that between approximately February 2019 and August 2020, the user of this phone number called a phone number associated with JOHANSSON's wife approximately 3,590 times.  Likewise, in an email dated on or about May 13, 2021, Western Distribution, LLC's dispatcher wrote to a client that the company's "Admin Manager" was "Brad" and listed the same -6840 number as "Brad's" number.

address at Western Distribution, LLC and listing the -6840 phone number as his cell phone, emailed the insurer repeatedly about the policy, purportedly on behalf of Advanced.  In one such email, dated on or about September 24, 2020, "Jay Johnson" asked the insurer for a discounted premium based on Advanced's "almost 3 years claims free," apparently alluding to the safety record of a company unrelated to the trucking companies that JOHANSSON actually owned.[4]

42.  Based on my training and experience, my knowledge of this investigation, and my discussions with colleagues at the DOT, I believe that "Jay Johnson" is yet another of JOHANSSON's aliases and that JOHANSSON was applying for insurance -- using an alias and a different trucking company's name and DOT number -- to "piggy back" off of Advanced's prior safety ratings while concealing his own involvement in the scheme, which very likely amounts to insurance fraud.

### D.   JOHANSSON's Decision to Make Western Distribution, LLC a Defunct Entity as of September 2019

43.  On or about July 23, 2019, JOHANSSON sent an email entitled "Western Distribution LLC" to the Registered Agent in Wyoming.  In the email, JOHANSSON asked, "1.  Can Western Distribution LLC be changed to a Corporation?  2.  Is the name: Advanced Distribution, Inc. available?"  (Emphases in original.) The Registered Agent replied to JOHANSSON in the affirmative.

---

[4] The "Risk Engineering Field Evaluation" discussed above states that "Jay Johnson" told the insurer that the company hauled "no aviation fuels," even though, according to Co-conspirator #2, Western Distribution, LLC's primary business was hauling jet fuel.

44.   According to a corporate resolution for Advanced Distribution, Inc. dated or about September 10, 2019 and filed with the Wyoming Secretary of State, "the Director, Carl Johansson, shall have full power and authority to act on behalf of Advanced Distribution, Inc."

45.   According to documents filed with the Wyoming Secretary of State and emails between JOHANSSON and the Registered Agent, on or about September 12, 2019, JOHANSSON caused Western Distribution, LLC to be converted into Advanced Distribution, Inc., a Wyoming corporation.

46.   According to documents obtained from the Registered Agent, JOHANSSON requested, and was billed approximately $495, for the conversion from the LLC to the corporation and the name change from Western Distribution to Advanced Distribution.

47.   According to a document entitled "Certificate of Conversion" from the Wyoming Secretary of State, "Western Distribution LLC, a Wyoming Limited Liability Company[,] Converted to Western Distribution, Inc., a Wyoming For Profit Corporation, On September 12, 2019."

48.   According to documents filed with the Wyoming Secretary of State and emails between JOHANSSON and the Registered Agent, on or about September 16, 2019, JOHANSSON caused Advanced Distribution, Inc. to change its name to Western Distribution, Inc.

49.   On or about September 17, 2019, the Registered Agent emailed confirmation of the name change to JOHANSSON, and wrote, in an email entitled "Western Distribution, Inc.," "Hello Brad,

Please see attached Name Change for your company Western Distribution, Inc." Attached to the email was a "Certificate of Name Change" from the Wyoming Secretary of State, dated on or about September 16, 2019, that stated, in relevant part: "Current Name: Western Distribution, Inc. Old Name: Advanced Distribution, Inc."

50. Based on the foregoing documents, to my knowledge, after on or about September 12, 2019, Western Distribution, LLC no longer existed as a legal entity. Instead, that entity had been converted, first, to Advanced Distribution, Inc., and then, a few days later, to Western Distribution, Inc., all at the direction of JOHANSSON.[5]

51. Based on my training and experience, and my knowledge of this investigation, it is highly unusual for someone to convert their LLC into a corporation and change its name twice in one week. It is even more unusual for someone to then disregard the newly formed corporation and continue operating the business as a defunct LLC. I am not aware of any legitimate purpose for such a scheme; to the contrary, while this investigation is ongoing, I believe that JOHANSSON's changes to the names and legal formulations of Advanced and Western Distribution were likely motivated by the insurance fraud scheme

_____

[5] On or about June 10, 2021, Western Distribution, LLC filed its biennial update with the California Secretary of State, in which the company claimed that it remained an active LLC in Wyoming. That was false, as the only active entity in Wyoming is the corporation that JOHANSSON caused to be established in September 2019. Nothing in the LLC's filings in Wyoming or California suggests that the LLC has been reconstituted elsewhere.

described above.  I also am not aware of any legitimate reason why (as detailed below) JOHANSSON would apply for the PPP loan in the name of the defunct LLC rather than in the name of the new corporation.  JOHANSSON's personal involvement in the highly unusual conversion of the LLC to a corporation in September 2019, as well as the PPP application in April 2020, causes me to conclude that it is extremely unlikely that he continued operating the defunct LLC by accident.

### E.   JOHANSSON's Control of Western Distribution, LLC

52.  Based on an interview of Co-conspirator #2 in April 2021 as well as previous interviews of Co-conspirator #2, I learned the following:

a.   Co-conspirator #2 has worked for JOHANSSON for nearly three decades, including at National, Wholesale, and Western Distribution, LLC.  At each company, her main responsibility has been handling the administrative side of JOHANSSON's business.

b.   JOHANSSON was (and is) the Managing Director of Western Distribution, LLC.  Western Distribution, LLC had many of the same management and employees as did Wholesale, which JOHANSSON also controlled and managed.  JOHANSSON set up Western Distribution, LLC because he anticipated being sent to prison in the Pending Criminal Case, and he envisioned his son, Co-conspirator #1, running the new company while he was in prison.

c.   JOHANSSON had the power to, and did, write checks for Western Distribution, LLC.  He determined his own pay and determined the amount of Co-conspirator #1's pay.

d.   Although JOHANSSON often listed his son, Co-conspirator #1, as the owner of Western Distribution, LLC, Co-conspirator #1 had almost no management role at the company.

53.  Based on my review of bank records relating to Western Distribution, LLC, I learned that JOHANSSON was the sole signatory on each of the company's bank accounts.

54.  Based on credit reports, academic records, and my own research, I know that for most of the time that Co-conspirator #1 has been the alleged owner of Western Distribution, LLC, he has held a day job as an entry-level financial analyst at an investment firm in Long Beach.  Co-conspirator #1 graduated from college in around 2019, lives with his parents, and, aside from his alleged ownership of Western Distribution, LLC, has no known experience in the trucking industry.  I am aware of no evidence that Co-conspirator #1 had any role in Western Distribution, LLC's PPP loan application in April 2020 (detailed below), other than purportedly reviewing and signing certain documents.[6]

**F.   Western Distribution, LLC's First PPP Loan Application in April 2020**

55.  In order to apply for the PPP loan, JOHANSSON opened a new bank account at a federally insured bank (the "Bank") in Modesto, California.  To do so, JOHANSSON caused Western Distribution, LLC to submit a number of documents to the Bank in around April 2020, including a Beneficial Ownership Certification Form, dated on or about April 22, 2020, the

---

[6] As discussed below, Co-conspirator #1 played a larger role in Western Distribution, LLC's loan forgiveness application and second PPP loan application in 2021.

express purpose of which was "[t]o help the government fight
financial crime" because "Legal Entities can be abused to
disguise involvement in . . . tax evasion, corruption, fraud,
and other financial crimes."  The form asked for the name "of
one individual with significant responsibility for managing the
Legal Entity," *i.e.*, Western Distribution, LLC.  The response
listed Co-conspirator #1 and claimed that he was the CEO of
Western Distribution, LLC.

56.  According to Co-conspirator #2 (JOHANSSON's office
administrator), JOHANSSON instructed her to fill out the PPP
loan application, and she emailed it to JOHANSSON for his
approval.

57.  Western Distribution, LLC's PPP loan application,
dated on or about April 24, 2020 and submitted to the Bank,
included the following:

a.   Western Distribution, LLC checked the box for
being an LLC, not one of the boxes for corporations.

b.   Western Distribution, LLC listed its average
monthly payroll as $174,556, for 31 employees.

c.   Western Distribution, LLC requested a PPP loan in
the amount of $436,390 (*i.e.*, approximately 2.5 times its
average monthly payroll).

d.   Co-conspirator #1 was listed as the owner of 100%
of Western Distribution, LLC.  The social security number listed
was the one associated with Co-conspirator #1.

e.   Question #3 of the loan application stated: "Is
the Applicant or any owner of the Applicant an owner of any

24

other business, or have common management with, any other business?  If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A."  The response was marked as "No," and no addendum A was included.

      f.   Question #5 of the loan application stated: "Is the applicant or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction ...?"  The response was marked as "No" and the initials "CJ" were handwritten next to the response.[7]

      g.   The loan application contained a number of certifications regarding the applicant's compliance with PPP regulations, including, for example, "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges for fraud."  The initials "CJ" were handwritten next to this statement.

      h.   Under all of the certifications, the form was signed in Co-conspirator #1's name as the "Member (owner)" and dated on or about April 24, 2020.

    58.  In order to support the value of payroll expenses

---

[7] JOHANSSON and Co-conspirator #1 both have the initials "C.J."

associated with the PPP loan, Western Distribution, LLC provided the Bank with two documents from Paychex (a payroll services company), both entitled "Payroll Report" and covering the first quarter of 2020, showing the payroll expenses of Western Distribution, LLC.  The Quarterly Reports showed the following:

      a.   Western Distribution, LLC had two accounts at Paychex:  (1) an account ending in -6410, covering approximately 24 employees (who appear to be Western Distribution, LLC's truck drivers); and (2) an account ending in -6403, covering approximately 16 employees (who appear to be Western Distribution, LLC's administrative staff and shop employees).

      b.   JOHANSSON was an employee who was being paid wages.

      c.   Co-conspirator #1 was not listed anywhere.

59.  A Paychex document entitled "Paycheck Protection Program Data," dated on or about April 5, 2020 and also submitted to the Bank, combined the data from the Payroll Reports and showed Western Distribution, LLC's total payroll costs for the first quarter of 2020 as $187,256.97.

**G.   Company A's PPP Loan Application in April 2020**

60.  As set forth above, JOHANSSON has controlled Company A since approximately 2003.  Company A's Manager (the long-time onsite manager for Company A and the company's former owner), confirmed in an interview in June 2021 that JOHANSSON and JOHANSSON's wife remain in control of Company A.

61.  Company A's Manager also confirmed that JOHANSSON and JOHANSSON's wife directed him to apply for a PPP loan in around

April 2020.  Company A's Manager said that JOHANSSON instructed him on how to answer almost every question on Company A's PPP loan application.

62.  Company A applied for a PPP loan, through its federally insured bank, on or about April 15, 2020.  Its application included the following:

a.   The average monthly payroll was listed as $114,602, for 25 employees.  The amount requested was $286,505 (*i.e.*, approximately 2.5 times the average monthly payroll).

b.   The owner of Company A was listed as JOHANSSON's 85-year-old mother, who was described as owning 100% of the company.  The address listed for JOHANSSON's mother corresponded to an actual address of JOHANSSON's mother, and the Social Security Number listed corresponded to JOHANSSON's mother as well.

c.   Question #3 of the loan application stated: "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business?  If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A."  The response was marked as "No," and no addendum A was included.

d.   Question #5 of the loan application form stated: "Is the applicant or any individual owning 20% or more of the equity of the Applicant subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction…?"  The response was marked as "No" and the initials of Company A's

Manager were digitally signed next to the response.

  e. Under all of the certifications, the form was digitally signed by Company A's Manager and dated on or about April 24, 2020.

63. Company A's Manager told me in June 2021 that he had no idea who owned Company A, but that he listed Johansson's mother because JOHANSSON instructed him to do so.  Likewise, Company A's Manager said that JOHANSSON instructed him regarding how to answer the questions about whether any of the company's owners had been indicted, and whether Company A had any common management with other entities.

64. When law enforcement attempted to interview JOHANSSON's mother in June 2021, she said that she did not remember if she owned a company called Company A because her late husband owned several companies.  (Her husband died in 2004.)  She had no recollection of applying for a government loan in Company A's name, and she said that she was not familiar with the name of Company A's Manager (despite the fact that Company A's Manager has been Company A's most senior employee for decades).  Similarly, when Company A's Manager was interviewed in June 2021, he said that he had never heard of JOHANSSON's mother until JOHANSSON directed him to list her as the owner on the PPP application.

65. Based on Company A's representations, Company A's bank issued a PPP loan to Company A in the amount of $286,500 on or about May 6, 2020.

H.   **Western Distribution, LLC's Expenditure of Its First PPP Loan**

66.   During an interview in around April 2021, Co-conspirator #2 (JOHANSSON's office administrator) told me the following:

a.   Once the COVID pandemic hit in March 2020, almost all of Western Distribution, LLC's business stopped and most of the company's employees were put on unemployment for approximately five months.

b.   The company did not rehire most of those employees until approximately August or September 2020.  Nor did the company pay most of the employees it had laid off during that period.  An exception to this was that JOHANSSON put his two sons on payroll after receiving the PPP loan; these were the only "employees" on Western Distribution, LLC's Paychex payroll from approximately April to August 2020.

67.   As part of this investigation, I obtained and analyzed bank records from Bank of America for Western Distribution, LLC. The analysis of the Bank of America account ending in -6403 showed that approximately $435,000 of PPP loan funds were received between on or about May 7, 2020 and June 11, 2020.  The analysis further showed that by on or about June 15, 2020, all proceeds from the PPP funding had been spent.  Specifically:

a.   On or about May 6, 2020 (*i.e.*, just before the PPP funds were disbursed), Account -6403 had an ending balance of $614.08.  On or about May 7, 2020, this account received the initial PPP deposit of $85,000.  On or about May 12, 2020, the

account had an ending balance of $284.66.  During this period, the entire $85,000 was either paid directly towards business expenses or payroll, or transferred to other accounts where it was subsequently spent.

b.   On or about May 13, 2020, Account -6403 had an ending balance of $65.49.  On or about May 14, 2020, this account received a PPP deposit of $75,000.  On or about May 15, 2020, the account had an ending balance of $14,344.65.  On or about May 15, 2020, $38,909.58 was either paid directly towards business expenses or payroll, or transferred to other accounts where it was subsequently spent.

c.   Similarly, Account -6403 received the following PPP payments:

i.   $50,000 on or about May 19, 2020;

ii.   $25,000 on or about May 22, 2020;

iii.   $20,000 on or about May 26, 2020;

iv.   $22,000 on or about May 28, 2020;

v.   $25,000 on or about May 29, 2020;

vi.   $39,000 on or about June 3, 2020;

vii.   $25,000 on or about June 4, 2020;

viii.   $40,000 on or about June 5, 2020; and

ix.   $29,000 on or about June 11, 2020.

d.   The PPP payments that Western Distribution, LLC received between on or about May 7, 2020 and June 11, 2020 totaled approximately $435,000.  As of on or about June 15, 2020, the ending balance in Account -6403 was $2,422.13.  All $435,000 was either paid directly towards business expenses or

30

payroll, or transferred to other accounts where it was
subsequently spent.

      e.  In terms of how much of the PPP funds Western
Distribution, LLC actually spent on payroll, according to
Paychex and tax documents, the only two employees that WESTERN
paid in the second quarter of 2020 (*i.e.*, April through June
2020, when the company spent the PPP funds) were JOHANSSON's two
sons: Co-conspirator #1 (the purported owner of Western
Distribution, LLC) and his brother. For example, a document
entitled, "Quarterly Contribution Return and Report of Wages,"
covering Western Distribution, LLC's second quarter of 2020,
lists JOHANSSON's two sons as the company's only paid employees
for that quarter.

      f.  Although the remainder of Western Distribution,
LLC's employees were no longer paid via Paychex in the second
quarter of 2020, an analysis of the company's bank records shows
that the company did continue paying a handful of employees via
company checks (*i.e.*, off of Paychex's books). For the period
from on or about May 7, 2020 to June 11, 2020 (*i.e.*, when
Western Distribution, LLC spent its PPP loan proceeds), these
company checks to employees totaled approximately $91,731.

    68.  An Employee Earnings Record for Western Distribution,
LLC, dated on or about September 18, 2020, shows Co-conspirator
#1 as having a hire date of on or about May 16, 2020, *i.e.*,
approximately eight days after the PPP loan was funded. As
stated above, none of the documentation submitted by Western
Distribution, LLC to the Bank as part of the PPP loan

application showed any payroll expenses for Co-conspirator #1. It was only after the loan was processed in his name that Co-conspirator #1 was added to the payroll for Western Distribution, LLC.  Based on my training and experience, and my knowledge of this investigation, this indicates that JOHANSSON was trying to create the appearance that his son was working at the business in conjunction with the funding of the loan which was dependent on his son's alleged representations as the purported owner.

**I.    The Transfer of Company A's Employees to Western Distribution, LLC's Payroll Account**

69.    To be eligible for forgiveness of a PPP loan, a borrower was required to spend at least sixty percent of its PPP loan on payroll expenses within 24 weeks after the PPP loan was issued.  Western Distribution, LLC's 24-week deadline was on or about October 19, 2020.  In September 2020, having laid off many of its employees from approximately April 2020 to August 2020, Western Distribution, LLC would have been unable to meet the sixty-percent threshold, and thus would have been ineligible for forgiveness of the entire loan, meaning the company, *i.e.*, JOHANSSON, would have had to pay back a portion of the PPP funds to the Bank.  Accordingly, in or about September 2020, JOHANSSON began implementing a scheme to transfer many of the employees of Company A onto the payroll of Western Distribution, LLC, so that Company A's payroll expenses for those employees could be counted as Western Distribution, LLC's payroll expenses, so that Western Distribution, LLC could deceive the Bank into believing

that Western Distribution, LLC had met the sixty-percent
threshold.  My bases for the foregoing conclusions include the
following:

a.   On or about September 22, 2020, Western
Distribution, LLC directed that 21 of Company A's employees (the
"21 Company A Employees") in Company A's Paychex account be
added to Western Distribution, LLC's Paychex account (effective
on or about September 16, 2020).[8]  From that date until at least
December 2020, the 21 Company A Employees were issued paychecks
by Western Distribution, LLC.

b.   In an interview in June 2021, Company A's Manager
said the following:

i.   At no point from September 2020 through
December 2020 did any of the 21 Company A Employees work for
Western Distribution, LLC.

ii.   JOHANSSON devised the scheme to put the 21
Company A Employees on the payroll of Western Distribution, LLC
by means of transferring them to Western Distribution, LLC's
account at Paychex.

c.   Email records corroborate the statement of
Company A's Manager that JOHANNSON directed Company A to
transfer its employees to Western Distribution, LLC's Paychex
account.  For example, on or about September 10, 2020, JOHANSSON
emailed the wife of Company A's Manager (who was Company A's
office manager), asking to discuss the requirements of the loan

---

[8] The 21 Company A Employees were D.A., D.A., G.B., J.C.B.,
J.C., M.C., N.E., J.F., R.G., G.H., T.H., J.H., D.M., J.M.,
R.M., C.M., E.M., D.O., E.P., B.P., and J.W.

forgiveness application.  Beginning on or about September 21,
2021, JOHANSSON and the wife of Company A's Manager exchanged
emails regarding JOHANSSON's proposal to create a "sub-account"
within Western Distribution, LLC's Paychex account for Company
A's employees.  JOHANSSON sent to the wife of Company A's
Manager the contact information for the Paychex representative
with whom JOHANSSON had spoken about setting up Company A's
"sub-account."  And when there were delays regarding the
paystubs for the 21 Company A Employees, the wife of Company A's
Manager emailed JOHANSSON to complain on or about October 6,
2020, and JOHANSSON responded a few minutes later saying that he
had just mailed them to her.  On some of these emails, JOHANSSON
used his personal email account rather than his account at
Western Distribution, LLC.

       d.   In an interview, Company A's Manager also said
that JOHANSSON forced Company A to cover the payroll expenses
for the 21 Company A Employees during the duration of the
scheme.  Company A's Manager said that Company A had to wire the
payroll expenses for the 21 Company A Employees to Western
Distribution, LLC even after those employees were shifted to
Western Distribution, LLC's Paychex account.  In other words,
even though JOHANSSON would later represent to the Bank that the
PPP funds that Western Distribution, LLC had received had been
spent (in part) on the 21 Company A Employees, that was false:
Company A was having to pay the payroll expenses of those
employees out of Company A's own accounts.  According to Company
A's Manager, JOHANSSON did not use Western Distribution, LLC's

own funds to pay the 21 Company A Employees.

      e.   Bank records corroborate the statement of Company A's Manager that JOHANSSON made Company A reimburse Western Distribution, LLC for the payroll expenses of the 21 Company A Employees.  Wire transfer records show that beginning in late September 2020 and continuing through December 2020, Company A sent approximately 26 wire transfers to Western Distribution, LLC totaling approximately $339,900, in amounts tied to the payroll expenses for the 21 Company A Employees who had been moved to Western Distribution, LLC's payroll.

      f.   Email records also show that JOHANSSON apparently did not see any need for the scheme to continue into 2021.  For example, on or about December 28, 2020, JOHANSSON wrote to the wife of Company A's Manager, "[M]ake this the last week ... go back to your own next week."  (Ellipsis in original.)  The next day, the wife of Company A's Manager wrote to Paychex, "We will go ahead and run the weekly payroll information we have you yesterday under the Western trucker account.... We will go back to everyone under the [Company A] account next week."

**J.   Western Distribution, LLC's Fraudulent PPP Loan Forgiveness Application**

70.  Western Distribution, LLC submitted a PPP loan forgiveness application to the Bank on or about January 19, 2021.  To be eligible for forgiveness of the PPP loan, Western Distribution, LLC was required to submit documentation of how it spent the PPP loan proceeds, including documents regarding payroll, rent, etc.

71.  According to Co-conspirator #2, she filled out the PPP loan forgiveness application at JOHANSSON's direction.

72.  The PPP loan forgiveness application form contained a number of certifications regarding the borrower's compliance with PPP regulations.  For example:

a.  "The dollar amount for which forgiveness is requested was used to pay costs that are eligible for forgiveness";

b.  "I understand that if the funds were knowingly used for unauthorized purposes, the federal government may pursue recovery of loan amounts and/or civil or criminal fraud charges"; and

c.  "The information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects."

73.  Next to each of these certifications, the initials "CJ" were handwritten.  The certification was signed in the name of Co-conspirator #1, who described himself as the LLC Member and dated the form "1/19/21."  The handwriting of the signature, as well as the handwritten initials "CJ" on the same page next to the certifications, look nothing like the signature and handwritten initials on Western Distribution, LLC's PPP loan application.  While I am by no means a handwriting expert, based on my training and experience, and my knowledge of this investigation (including the fact that JOHANSSON learned of the investigation in late 2020), I believe that JOHANSSON had Co-conspirator #1 sign the loan forgiveness application, whereas I

believe that in April 2020 JOHANSSON likely signed the PPP loan application forms using Co-conspirator #1's name.[9]

74.  The payroll records from Paychex that Western Distribution, LLC submitted to the Bank as part of the loan forgiveness application listed the employees not only from Western's own Paychex accounts (-6403 and -6410), but also a separate account (-0968) including the 21 Company A Employees as well as eight employees of a Texas company associated with JOHANSSON.  Specifically, Western Distribution, LLC provided the Bank a spreadsheet entitled "PPP Forgiveness Data," dated on or about December 11, 2020, purporting to show Western Distribution, LLC's payroll expenses from on or about May 5, 2020 to October 19, 2020.  The spreadsheet shows the following:

a.  Twenty-two employees from Western's two Paychex accounts had a combined pay of $235,166.51.

b.  Twenty-nine employees from the -0968 account had a combined pay of $121,425.01.

c.  The total payroll was $356,591.52.

d.  Co-conspirator #1 was the highest paid employee on the spreadsheet, with pay more than double the next highest employee of Western Distribution, LLC or Company A.

75.  When the Bank asked Western Distribution, LLC for details regarding its 2020 payroll on or about February 19, 2021, Co-conspirator #2 responded three days later that "We have

---

[9] The government is conducting a handwriting analysis of the various signatures to determine if JOHANSSON forged his son's signatures on the PPP loan application; the results are not yet available.

3 different accounts with Paychex – different area / departments etc."  Western Distribution, LLC did not disclose to the Bank that the 21 Company A Employees did not work at Western Distribution, LLC.  Nor did Western Distribution, LLC disclose to the Bank that Company A was not a department of Western Distribution, LLC but rather a separate company with a separate location and a separate business.

76.  As of on or about June 29, 2021, the Bank was still processing the loan forgiveness application.  On or about that date, I was told by the Bank that its review and approval of the forgiveness application were imminent.

**K.   Western Distribution, LLC's Fraudulent Second PPP Loan Application in March 2021**

77.  On or about March 24, 2021, Western Distribution, LLC applied for a second PPP loan (the "Second PPP Application"), also through the Bank.  The Second PPP Application included the following:

a.   The amount requested was $231,527 (*i.e.*, 2.5 times the purported Average Monthly Payroll of $92,611).

b.   The company again claimed that it was an LLC, rather than a corporation.

c.   The owner was listed as Co-conspirator #1, who was described as owning 100% of the company and listed a social security number matching Co-conspirator #1.

d.   Question #3 stated: "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management (including a management agreement) with any

other business?  If yes, list all such businesses (including their TINs if available) and describe the relationship on a separate sheet identified as addendum A."  The response again was marked as "No," and no addendum A was included.

     e.   Question #4 stated: "Is the applicant or any individual owning 20% or more of the equity of the Applicant presently incarcerated or, for any felony, presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction?"  The response again was marked as "No" and the initials "CJ" were handwritten next to the response.

     f.   The application listed a series of certifications to be made by the borrower, similar to the ones discussed above for Western Distribution, LLC's first PPP loan application.  For example, "I certify that the information provided in this application and the information provided in all supporting documents and forms is true and correct in all material respects."  The initials "CJ" were written next to each certification.

     g.   The application was signed by Co-conspirator #1, whose title was listed as "Owner," and dated on or about March 24, 2021.

     h.   Documents submitted by Western Distribution, LLC as part of the Second PPP Application reflected the same scheme on which the company based its loan forgiveness application two months earlier:  Western Distribution, LLC artificially inflated its payroll costs by including Company A's employees who never

worked for Western Distribution, LLC.  The Second PPP
Application lumped together Paychex account -0968 (containing
the 21 Company A Employees), which had $139,934 in payroll
expenses in September and October 2020, with Western's two other
Paychex accounts.  The payroll expenses for account -0968 were
higher than the payroll expenses for Western's other Paychex
accounts (due in part to the fact that JOHANSSON removed almost
all of his employees – except his two sons – from the Paychex
payroll for much of 2020).

78.  Based on the representations in the application, on or
about March 24, 2021, the Bank issued a second PPP loan to
Western Distribution, LLC in the amount of $231,527.

79.  Company A was likely ineligible to receive a second
PPP loan because the pandemic did not cause the company the
requisite twenty-five percent decline in revenues for any
quarter in 2019 as compared to the same quarter in 2020.  Based
on my training and experience, and my knowledge of this
investigation, I believe that JOHANSSON represented to the Bank
in the Second PPP Application that the Company A employees were
actually employees of Western Distribution, LLC -- even though
they were not -- because (1) he need to be consistent with the
fraudulent PPP loan forgiveness application that he had caused
Western Distribution, LLC to submit only months earlier, and (2)
he knew that Company A was ineligible to obtain a second PPP
loan on its own.

L. **JOHANSSON's Concurrent Fraud on the Department of Transportation**

80. At the same time that JOHANSSON was claiming that Western Distribution, LLC had dozens of employees for purposes of the PPP fraud, he was causing the company to make filings with the DOT that told a much different story.

81. As noted above, on or about April 25, 2019, JOHANSSON filed a Form MCSA-1 to register Western Distribution, LLC with the FMCSA, in which he wrote that Western Distribution, LLC operated only one tanker truck. Under penalty of perjury, in response to the question, "Do you currently have, or have had within the last 3 years of the date of filing this application, relationships involving common stock, common ownership, common management, common control or familial relationships with and FMCSA-regulated entities?," JOHANSSON responded "No."[10]  As a result of the filing of the Form MCSA-1, JOHANSSON obtained a DOT registration number for Western Distribution, LLC (#3278747).

82. The following chart shows relevant data from the MCS-150 forms (MCS-150 forms are periodic updates required by FMCSA) submitted by Western Distribution, LLC (DOT #3278747) and Western Distribution, Inc. (DOT #3533763):

---

[10] Based on my discussions with colleagues at the DOT, Wholesale was a FMCSA-regulated entity because, at a minimum, it hauled jet fuel in interstate commerce.

| Date | Named Entity | DOT Number | Signatory (and Title) | Total Number of Drivers |
|------|------|------|------|------|
| 5/17/2019 | LLC | 3278747 | Carl Brad Johansson (CEO) | 1 |
| 4/6/2020 | Corp. | 3278747 | Carl Johansson (President) | 3 |
| 10/5/2020 | Corp. | 3278747 | Carl Johansson (Operations Manager) | 28 |
| 11/2/2020 | Corp. | 3278747 | Carl Johansson (Operations Manager) | 1 |
| 12/23/2020 | LLC | 3533763 | Carl Johansson (Admin. Manager) | 1 |
| 12/29/2020 | Corp. | 3278747 | Carl Johansson (Operations Manager) | 1 |

83.   The signatory on each of these forms certified that,
"[u]nder penalties of perjury, I declare that the information
entered on this report is, to the best of my knowledge and
belief, true, correct, and complete."  Based on my training and
experience, and my knowledge of this investigation, I believe
that JOHANSSON was the signatory for each of these forms (*i.e.*,
rather than Co-conspirator #1, who has a very similar name).
For example:

a.   The person applying for a PIN number for the
FMCSA online portal for Western Distribution, Inc. was using the
Western Distribution email account that Co-conspirator #2
confirmed was JOHANSSON's email account.  (Co-conspirator #2
also confirmed that Co-conspirator #1 did not have an email
account at Western Distribution.)

b.   The email account listed on each of these MCS-150
Forms was JOHANSSON's email account.

c.   For more than a decade (first at National, and

then at Wholesale, and then at Western Distribution, LLC),
JOHANSSON has commonly referred to himself as the Administrative
Manager and Operations Manager of his companies, which is the
same title used to describe "Carl Johansson" on the MCS-150
forms.

84.  Based on my review of the Paychex payroll records for
Western Distribution, LLC, and my training and experience, I
believe that the information that JOHANSSON caused to be
submitted on the MCS-150 Forms was false and misleading.  During
the fall of 2020, for example, Western Distribution, LLC
employed at least 17 drivers (excluding the Company A employees
fraudulently transferred to Western Distribution, LLC's Paychex
account).  Likewise, Western Distribution, LLC – a trucking
company that JOHANSSON repeatedly claimed to FMCSA had only one
driver – reported approximately $1 million in "Gross Trucking
Income" on its books for each quarter in 2020.

85.  In contrast, there is no Paychex account for Western
Distribution, Inc., and I am not aware of any drivers employed
by Western Distribution, Inc.  It is possible, even likely, that
Western Distribution, Inc. has never carried out any actual
trucking activities.  For example, the FMCSA database for
roadside inspections (which tracks when trucks operated by a
registered trucking company are inspected at certain roadside
locations) does not contain a single inspection record for
trucks operating under DOT #3278747.  Based on my discussions
with colleagues at the DOT, I believe that it is unusual for a
trucking company not to have any roadside inspections.  Based on

the Paychex data and the lack of any roadside inspections for
Western Distribution, Inc., I believe that JOHANSSON's sworn
claim that Western Distribution, Inc. employed 28 drivers on
October 5, 2020 was false.

86.  As the chart above shows, sometime on or before
December 23, 2020, JOHANSSON obtained a second DOT registration
number for Western Distribution, LLC (DOT #3533763).  Based on
my training and experience, and my discussions with colleagues
at the DOT, there does not appear to be any legitimate reason
why JOHANSSON would need two different DOT registration numbers
for Western Distribution.  This appears to be a continuation of
JOHANSSON's decades-long practice of obtaining and maintaining
multiple DOT registration numbers to evade regulators and,
likely, secure insurance policies and clients that otherwise
would have been unavailable to JOHANSSON due to his trucking
companies' history of safety violations.

//
//
//
//
//
//
//
//
//
//
//

## V.   <u>CONCLUSION</u>

87.   Based on the foregoing, there is probable cause to believe that JOHANSSON violated Title 18, United States Code, Sections 1344(2) and 2(b) (bank fraud and causing an act to be done) and Title 18, United States Code, Section 1349 (conspiracy to commit bank fraud).


/ S / _____
DANIEL DREYER, Special Agent
Internal Revenue Service –
Criminal Investigations


Subscribed to and sworn before
me on July  2 , 2021.

_____
HONORABLE ALEXANDER F. MacKINNON
UNITED STATES MAGISTRATE JUDGE

45